**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CE DESIGN LTD., an Illinois corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) |
| Plaintiff, | ) Case No. 07 C 5456 |
| | ) |
| v. | ) Judge Matthew F. Kennelly |
| | ) |
| CY's CRAB HOUSE NORTH, INC. and CY's CRABHOUSE & SEAFOOD GRILL, INC., | ) ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION TO STRIKE LETTER FROM CAROLYN ABRAHAM
OR, IN THE ALTERNATIVE, RESPONSE IN OPPOSITION TO CAROLYN
ABRAHAM'S *EX POST* REQUEST FOR PROTECTIVE ORDER**

NOW COMES plaintiff, CE Design, Ltd., and moves the Court to strike the letter

submitted by Carolyn Abraham or, in the alternative, deny Carolyn Abraham's *ex post* request for

protective order.  In support, Plaintiff states as follows:

**BACKGROUND**

1.      Prompted by "an attorney of one of the businesses now being sued," Caroline

Abraham has sent the Court an *ex parte* letter about matters having nothing to do with this

litigation.  She has sent similar letters in other cases.

2.      Some of the information Plaintiff provided in support of class certification was

obtained pursuant to a subpoena issued from the U.S. District Court for the Eastern District of

New York to Caroline Abraham, who owned and operated a now-defunct sole proprietorship

known as "Business to Business Solutions" ("BTB").  Doc. 130-4 (Deposition of Caroline

Abraham, Sept. 16, 2008).

3.      During her deposition, Caroline Abraham testified that BTB owned the computers

and fax lines through which Macaw transmitted Defendant's advertisements by fax. *E.g.*, Doc. 130-4, pp. 8, 10-11, 41-44, 58. She also testified that BTB had no employees. Doc. 130-4, p. 8.

4.      Plaintiff also obtained some information from Joel Abraham, Caroline's son, pursuant to a subpoena issued from the same court. Doc. 130-8 (Deposition of Joel Abraham, Jan. 8, 2009); Caroline Abraham letter (attaching two subpoenas to Joel Abraham).

5.      During his subpoenaed deposition, at which he was represented by counsel, Joel Abraham identified and discussed a DVD labeled 060430 (which he had produced in response to subpoenas from two different cases and issued out of the U.S. District Court for E.D.N.Y.) and a CD he had created by extrapolating data from the DVD about the Cy's Crabhouse fax broadcasts.

6.      Joel testified that he made that backup DVD on April 30, 2006. Doc. 130-8, pp. 20-21 & p. 18, lines 13-25, p. 19, lines 1-14. Joel testified that he was not an employee of BTB. Doc. 130-8, p. 64, lines 20-25, p. 65, lines 1-2; p. 91, lines 7-14.

7.      Ms. Abraham's letter to the Court complains about Plaintiff's counsel's use of the DVD, attaching two subpoenas that were issued to Joel Abraham, but Joel Abraham produced the DVD without claiming confidentiality or privilege. He was represented by a lawyer at the time.

8.      The only substantive, documented communication between Plaintiff's counsel and Caroline Abraham in any manner pertaining to the permitted use or dissemination of any of the information that she had provided, or would be providing, is reflected in a December 16, 2008 email sent to her by Ryan Kelly, counsel for plaintiffs in both this case and the *G.M. Sign v. Finish Thompson* case. A true and correct copy is attached as Exhibit A. In that email, Mr. Kelly advised Ms. Abraham that he would be having a protective order entered in the *G.M. Sign* case that would "prevent [him] from disclosing any of the back-up disks or hard drive to any third-party." Exhibit A, p. 1. Mr. Kelly's email attached a proposed protective order he would ask the

court to enter in the *G.M. Sign* case.  Exhibit A, pp. 2-8)  By its plain terms, that protective order would not automatically create any "confidentiality" for the information or materials that Ms. Abraham might produce in the *G.M. Sign* case, but rather would require the producing person— *e.g.*, Ms. Abraham—to follow specific and timely procedural steps to "designate" specific information or materials as "confidential."  Absent such specific and timely designation, no confidentiality would be accorded to any of the information or materials produced.  The only further documented communications between Mr. Abraham and Ms. Kelly in this regard were (a) Ms. Abraham's email response dated December 22, 2008, in which she said, "Can we discuss the protective order when I see you on Sunday?" and Mr. Kelly's email reply dated December 24, 2008, in which he said, "We can talk about the protective order Sunday."  True and correct copies of this correspondence is attached as Exhibit B.

9.      The protective order referenced in, and attached to, Mr. Kelly's aforementioned December 16, 2008 email to Ms. Abraham was entered by the court in the *G.M. Sign* case on January 14, 2009.  A true and correct copy is attached as Exhibit C.

10.      Long before the above-referenced protective order was entered in the *G.M. Sign* case, an almost-identical protective order had been entered in the case at bar case on July 16, 2008.  A true and correct copy is attached as Exhibit D.

11.      In other words, in both this case and the *G.M. Sign* case, nearly-identical protective orders were entered that created a specific procedure by which a party or non-party could seek to have information or materials that he or she was producing deemed confidential.  Both protective orders required the producing party to timely and properly designate specific materials as "confidential."  Doc. 81, pp. 3-5.  Both protective orders contained language establishing that a producing party's failure to timely and properly make such designations would result in waiver of

any right to confidentiality as to produced information or materials.  These protective orders
afforded Ms. Abraham the opportunity to attempt to limit the use or dissemination of the
information and materials obtained from BTB's computers in the two cases.

12.     Neither Ms. Abraham, nor her counsel acting on her behalf, ever invoked the
protections afforded under either of the described protective orders.  Abraham never designated
any of the information or materials that she produced as "confidential"; not before the production;
not at the time of the production; not promptly after the production.  Furthermore, no one – not
Ms. Abraham, not her son, not their counsel – ever stated, contended, urged, implied or insinuated
that any of the information contained on the DVDs and hard-drive was proprietary or competitive.
Indeed, Ms. Abraham has always maintained that the data belonged to Macaw, a Romanian
company operating through her computers and phone lines.  *E.g.* Doc. 130-4, pp. 68, 69, 101.

13.     Ms. Abraham is no "babe in the woods" and has had several run-ins with the
federal government.  Exhibits E (FCC letter), F (FTC injunction), and G (journal article).

14.     Later, at the request of Plaintiff's counsel (and without subpoena), Ms. Abraham
provided information regarding other fax transmission activities involving other advertisers (*i.e.*,
other than Defendant), never claiming any of the information was confidential, privileged or
protected.  *See, e.g.*, true and correct copies attached as Exhibit H and Exhibit I.

15.     On or about February 22, 2010, Ms. Abraham sent a letter to this Court.  In her
letter, Ms. Abraham complains that Plaintiff's counsel has made what she believes to be improper
or impermissible use of the information contained on the aforementioned DVDs and hard-drive.
She asks that this Court do something to "stop" Plaintiff's counsel in this regard.

16.     By Order dated March 12, 2010, this Court scheduled a status conference in this
case for April 7, 2010.  In its Order, the Court indicated that Ms. Abraham's letter would be

addressed at the April 7 status conference, and the Court further ordered that any motions or responses by the parties related to Ms. Abraham's letter must be filed by March 28, 2010.

17.     Plaintiff files the instant pleading in accordance with the Court's March 12 Order. By this pleading, Plaintiff moves to strike Ms. Abraham's letter from the record.  In the alternative, assuming (without conceding) that Ms. Abraham's letter could be treated as a non-party motion for a *ex post* protective order, Plaintiff hereby responds in opposition thereto.

## **MOTION TO STRIKE**

18.     Plaintiff moves to strike Ms. Abraham's letter because, among other reasons:

> a.     Ms. Abraham is not a party to this litigation and has no standing to file or submit anything to the Court;
>
> b.     Ms. Abraham's letter constitutes an improper and impermissible *ex parte* communication with the Court;
>
> c.     Ms. Abraham's letter contains scandalous, impertinent and unfounded accusations; and
>
> d.     Ms. Abraham's letter does not seek any proper relief the Court could grant.

19.     Ms. Abraham is not a party to this litigation, and she has no standing to file or submit anything to the Court.  It is axiomatic that, except in very rare circumstances not present in the case at bar, a non-party lacks standing to file or submit pleadings, documents or prayers for relief in court, and the proper remedy is to strike such improperly filed or submitted matter.  *See, e.g.*, *Wasson v. Riverside County*, 237 F.R.D. 423, 424 n.1 (C.D. Cal. 2006) (noting that the court had previously stricken a Rule 12(b)(6) motion to dismiss filed by non-parties because those non-parties lacked standing to file such a motion); *see also In re Pickup Truck Fuel Tank Products Liability Litigation*, 1996 WL 683785 at *4 (E.D. Pa. 1996) (observing that a federal court may only adjudicate the claims of persons who are parties before it, and holding that non-parties to a class action are without standing to present claims to the court); *Fulbright & Jaworski, L.L.P. v.*

*Mariner Health Care, Inc.*, 2006 WL 3447688 at *6 (W.D. Tex. 2006) (holding that non-parties

lacked standing to request that documents produced in discovery be unsealed for inspection);

*Arkansas Chronicle v. Easley*, 321 F. Supp. 2d 776 (E.D. Va. 2004) (holding that a non-party to a

criminal prosecution lacks standing to suppress evidence in a criminal case).

20.    The protective order entered in this case on July 16, 2008, might have created a

temporally-limited opportunity for Ms. Abraham to file pleadings in this Court in support a timely

designation of "confidentiality" as to information or materials that she had produced.  If Ms.

Abraham had timely and properly designated something that she was producing as "confidential"

and Plaintiff's counsel had challenged that designation, then the protective order might have

given Ms. Abraham the limited standing necessary to argue in support of asserted confidentiality.

The protective order expressly requires that any information claimed to be confidential must be

marked "confidential" prior to its production.  Exhibit D (Doc.81), pp. 3-5.  As indicated, Ms.

Abraham never designated anything as confidential under the protective order, and whatever

"window" of standing that she otherwise could have had before this Court is long-closed.

21.    Ms. Abraham's letter also constitutes an improper and impermissible *ex parte*

communication with the Court.  *See Lucien v. Peters*, 1994 WL 465807 at *1 (N.D. Ill. 1994)

(Shadur, J.) (noting the "general inappropriateness" of "unbidden letters to a judge"); *Davidson v.*

*Scully*, 155 F. Supp. 2d 77, 81 (S.D.N.Y. 2001) (observing that the "practice of 'litigation by

letter' … is an insufficient means of seeking relief from a court").

22.    Even a party to a pending case should not submit documents to a court in an *ex*

*parte* manner, and that such improperly submitted documents should be stricken.  *See, e.g., Peart*

*v. City of New York*, 992 F.2d 458, 463 (2nd Cir. 1993) (attorney's *ex parte* letter to the court

could not substitute for a proper motion requesting relief from the court, and that the trial court

did not abuse its discretion in not affording her an opportunity to be heard on her request for

relief); *Northwest Airlines, Inc. v. American Airlines, Inc.*, 870 F. Supp. 1504 (D. Minn. 1994)

(refusing to consider materials submitted to court *ex parte*); *Stapleton v. Wilson*, 2007 WL

31220121 (E.D. Ky. 2007) (striking *ex parte* letters submitted to court by pro se plaintiff); *Twitty

v. Wiley*, 2008 WL 582188 at *1 (D. Colo. 2008) (ordering clerk of the court to strike any further

*ex parte* correspondences by plaintiff with the court).  If a party to a pending case may not file

documents *ex parte*, then *a fortiori*, a non-party may not do so.

23.     Ms. Abraham's letter also contains scandalous, impertinent and unfounded

accusations.  Specifically, and among other things, her letter contains the following unfounded

accusations or representations of fact:

> a.     That she "believes" evidence obtained from her is being used
>        "improperly";
>
> b.     That she "believes" the plaintiffs and class members in other cases do not
>        possess other evidence of the thousands of junk faxes Macaw sent through
>        BTB; and
>
> c.     That she "believes" Plaintiff's counsel are "selling" the information
>        obtained from her.

These accusations, which are unmistakably intended to impugn the integrity of Plaintiff's

counsel, are completely lacking in any identified factual basis, and even if true (which they are

not) would not provide a basis for any relief.  Ms. Abraham's "belief[s]" are asserted without

stating the factual bases for those beliefs.  Ms. Abraham's conclusion regarding the supposed

"improper" use of evidence is set forth without identifying the specific impropriety being alleged.

Ms. Abraham's contention that the information provided by her was an absolute prerequisite to

the filing of other cases is both unsupported and illogical.  More important, even if true (which,

again, they are not), these accusations would not provide a basis for any relief in this case.

24.     Rule 12(f) of the Federal Rules of Civil Procedure provides that a district court, on its own or on motion of a party, may strike any "redundant, immaterial, impertinent or scandalous matter." 28 U.S.C. Fed. Rules Civ. Proc. 12(f). "Impertinent matter" has been held to consist of "statements that do not pertain, and are not necessary, to the issues in question." *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 258 F.R.D. 663 (W.D.Wash. 2009). The above-referenced portions of Ms. Abraham's letter comport with that definition. Further, accusing an officer of the court of impropriety in a conclusory manner, without any supporting evidence, is "scandalous."

25.     Ms. Abraham's letter does not seek any proper relief that the Court could grant. In fact, Ms. Abraham's letter does not specify any particular relief that she is seeking other than that she wants the Court to "stop" the use of information in the ongoing prosecution of pending cases in other jurisdictions, and in the future prosecution of un-filed cases. The letter does not identify a legal basis upon which the Court could do that, or a legal method by which the Court could accomplish that. Plaintiff's counsel is unaware of any legal basis for such relief, or any available judicial method to accomplish such relief.

### ALTERNATIVE RESPONSE IN OPPOSITION
### TO NON-PARTY'S REQUEST FOR *EX POST* PROTECTIVE ORDER

26.     Without waiver of the above-recited motion to strike, but only in the alternative, and assuming (without conceding) that Abraham's letter to the Court may be treated as a request for an *ex post* protective order, Plaintiff submits this response in opposition to such request.

27.     Ms. Abraham is not entitled to an *ex post* protective order because:

     a.     She has not complied with the terms of the Court's July 16, 2008 protective order that provided her with a full and fair opportunity to seek any protection to which she believed she was entitled, and she has not offered, nor could she offer, any evidence of excusable neglect for having failed to do so. Therefore, she has waived any right to seek protected or "confidential" status as to any of the information or materials that she previously produced; and

      b.     She has not asserted, nor could she assert, that the information and materials obtained were "confidential" within the meaning of the existing protective order, or otherwise deserving of protected status – *i.e.*, even if she had timely designated the information and materials in question as "confidential" under the protective order, that designation would not have survived Plaintiff's challenge to such designation, and there is no other basis upon which the information and materials in question would be deserving of a protective order.

28.     Ms. Abraham has not offered any explanation for her failure to timely invoke the procedural protections available to her under the existing protective order.  She knew or could have known that a protective was in place in the case at bar, and she definitely knew that a protective order was being entered in the *G.M. Sign* case.  She knew that she was required to take specific and timely steps to designate the information and materials she was producing as "confidential" under those protective orders if she desired any limitation or restriction upon the use and dissemination of such information and materials.  Nevertheless, she failed to do so.  She also failed to seek any other timely protections, beyond those available under the protective order, to limit or restrict the use or dissemination of the information and materials in question.  If she had any rights, she elected not to invoke them.  Absent some factually-supported argument of excusable neglect, which is glaringly absent from her unsworn letter to the Court, she must be held to have waived her right to seek after-the-fact protected status for what she has produced.  Indeed, the protective order itself provides for such waiver.

29.     Perhaps more importantly, even if the Court were to overlook the untimeliness of Ms. Abraham's prayer for relief, and the waiver resulting therefrom, there is simply no basis for any protected status as to the information and materials in question because:

      a.     The information in question is not actually the property of Ms. Abraham, and so she has no standing to assert a protectable interest in same, or to request judicial protection regarding same;

b.      The information and materials do not qualify for protection as proprietary information or trade secrets;

c       The information and materials do not qualify for protection as competitive business information;

d       Any alleged protected status of the information and materials was waived by Ms. Abraham's provision of the information and materials to her son, Joel Abraham, who was never employed by her or her company;

e.      Ms. Abraham's conduct in voluntarily searching the databases in question and providing information extrapolated therefrom regarding other advertisers for which Macaw provided services through BTB's computers and phone lines demonstrates that Abraham never viewed the information in question as being protected;

f.      The fact that the information and materials in question were developed and used in furtherance of serial violations of federal law negates any other, conceivable protected status.

## A.      **Protective Orders in General**

30.     "As a general proposition, pretrial discovery must take place in ... public unless compelling reasons exist for denying the public access to the proceedings." *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994).  To obtain a protective order and "overcome the presumption of [public access], the court may construct a broad 'umbrella' protective order upon a threshold showing by one party (the movant) of good cause." *Grove Fresh Distributors, Inc. v. John Labatt, Ltd.*, 888 F. Supp. 1427, 1443, (N.D. Ill. 1994) (Zagel, J.), quoting *Leucadia, Inc. v. Applied Extrusion,* 998 F.2d 157, 166 (3rd Cir. 1994).  A party or nonparty must overcome the presumption of openness by showing that discovery presents a risk to some protectable privacy interest or "good cause." "A court may make a protective order under Fed. R. Civ. P. 26(c) only for good cause shown." 10A Fed. Proc. L. Ed. § 26:279.

31.      "Good cause" is defined as "annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  "In determining whether good cause exists, courts

balance the public's interest in having access to the proceeding against the litigants' property and
privacy interests." *Baker v. Buffenbarger*, Case No. 03 C 5443, 2004 WL 2124787, at *2 (N.D.
Ill. Sept. 22, 2004), citing *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d
943, 945 (7th Cir. 1999).

      32.     A protective order may include one or more of the following:

          a.     Forbidding the disclosure or discovery;

          b.     Specifying terms, including time and place, for the disclosure or discovery;

          c.     Prescribing a discovery method other than the one selected by the party
seeking discovery;

          d.     Forbidding inquiry into certain matters, or limiting the scope of disclosure
or discovery to certain matters;

          e.     Designating the persons who may be present while the discovery is
conducted;

          f.     Requiring that a deposition be sealed and opened only on court order;

          g.     Requiring that a trade secret or other confidential research, development, or
commercial information not be revealed or be revealed only in a specified
way; and

          h.     Requiring that the parties simultaneously file specified documents or
information in sealed envelopes, to be opened as the court directs.

Fed. R. Civ. P. 26(c)(1).

      33.     The above "good cause" standard pertains to both protective orders actually issued
by the court *and* protective orders reached by mutual accord of the parties. *Jepson,* 30 F. 3d at
858.  "In deciding whether to issue a stipulated protective order, the district court must
independently determine if 'good cause' exists." *Id.*  Furthermore, "'if good cause is not shown,
the discovery materials in question should not receive judicial protection....'" *Id., quoting Public
Citizen v. Liggett Group Inc*., 858 F.2d 775, 789 (1st Cir. 1988).  Thus, an exchange takes place,

one in which "judicial protection," *i.e.*, the court's authority, is bestowed on an agreed-upon protective order in exchange for the order's having satisfied Rule 26 standards.

34.    "Absent a protective order, parties to a law suit may disseminate materials obtained during discovery as they see fit." *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994).  At base, a party may "generally do what it wants with material obtained through the discovery process, as long as it wants to do something legal." *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 683-684 (5th Cir. 1985).

**B.    According to Ms. Abraham, the information in question is not her's and, therefore, she lacks standing to assert a protectable interest in same, or to request judicial protection regarding same**

35.    It is axiomatic that a person who has no personal interest in particular information or materials has no standing to seek judicial protection related to such information or materials.

36.    Based on information provided by Ms. Abraham herself, it is evident that the information contained on the DVDs and hard-drive discussed in her letter is not her property.

37.    In her deposition, Ms. Abraham testified that Business to Business Solutions is a company that she owned and operated out of her home, and that at one time provided phone lines, banking services, and secretarial services to a company named Macaw or Maxileads that sent fax advertising. *E.g.* Doc. 130-4, pp. 8, 10-11.  She also testified that she did not control the transmission of fax ads, that she did not use any service or software.  She also testified that she didn't know about the software used by the Macaw personnel who controlled the transmissions. *E.g.* Doc. 130-4, pp.91-92, 101.

38.    Thus, it is clear that Ms. Abraham's company, computer hard-drive and telephone lines merely provided a conduit through which another company, Macaw, conducted unsolicited advertising fax transmission activities in the United States.

39.     Ms. Abraham has no personal ownership of, or protectable interest in, information that incidentally downloaded to her computer system from Macaw's business activities.

C.     **The information and materials in question do not qualify for protection as proprietary information or trade secrets.**

40.     Ms. Abraham has neither alleged, nor could she prove, that the information and materials produced in this case, in the *G.M. Sign* case, and in other cases constitute proprietary information or trade materials.  Nor has she alleged, nor could she prove, that the information and materials contained protected or confidential information about Abraham or BTB.

41.     To the contrary, the only things produced were information identifying the advertisers (like Defendants) that hired Macaw to send advertising faxes illegally, the advertisers' communications with Macaw, and information about the recipients of the illegal fax transmissions that were sent.

42.     Ms. Abraham has not attempted to prove, nor could she prove, that the identities of Macaw's prior "customers" were proprietary or confidential, that their communications with Macaw were proprietary or confidential, or that the publicly-accessible information about the targets of the fax broadcasts were proprietary or confidential.

D.     **The information and materials do not qualify for protection as competitive business information.**

43.     Ms. Abraham has neither alleged, nor could she prove, that the materials produced in this case and in the *G.M. Sign* case constitute competitive business information.

44.     In fact, the evidence demonstrates just the opposite – *i.e.*, that Ms. Abraham no longer engages in the type of business to which the information and materials relate.  *E.g.* Doc. 130-4, pp. 76, lines 15-18, p. 77, lines 5-12.

45.     It goes without saying that if Ms. Abraham is no longer involved in the business pursuit in question, then the information and materials at issue are of no competitive business

value to her, and therefore, such information and materials are not protectable on that basis.

**E.**  **Any alleged protected status of the information and materials was waived by Ms. Abraham's provision of the information and materials to her son, Joel Abraham, who was never employed by her or her company and who produced the documents without claiming confidentiality.**

46.     It is undisputed that Ms. Abraham gave possession and custody of the DVDs and hard-drive in question to Joel Abraham, who thereafter produced them to Plaintiff's counsel.

47.     It is also undisputed that Joel Abraham was not, at any time, an employee of or in privity with Ms. Abraham.

48.     By providing the materials in question to a third party with whom she was not in privity, Ms. Abraham waived any protection that might otherwise have applied.  *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 139 (N.D. Ill. 1993) ("[M]aterial which is otherwise privileged is discoverable if it has been disclosed to a third party").

**F.**  **Ms. Abraham's conduct in voluntarily searching the computer data in question and providing information extrapolated therefrom regarding other vendors for whom she had provided services demonstrates that she never viewed the information in question as being protected.**

49.     As indicated earlier in this pleading, after Ms. Abraham produced the DVDs and hard-drive in question to Plaintiff's counsel, but before Plaintiff's counsel had figured out how to access and search those materials, Ms. Abraham agreed to cooperate with Plaintiff's counsel by reviewing the materials herself to assist in the extrapolation of information regarding Macaw's fax transmission activities on behalf of other companies.

50.     Ms. Abraham's willingness to undertake this "cooperative" effort to facilitate the ability of Plaintiff's counsel to pursue other actions, against other defendants, using information derived from Macaw's now-defunct business database in Abraham's possession strongly weighs against her current argument that seems to suggest such information is protected, or that it is somehow an abuse by Plaintiff's counsel to use such information in furtherance of other cases.

**G.**     **The fact that the information and materials in question were developed and used in furtherance of serial violations of federal and state laws negates any other, conceivable protected status.**

51.     The pending Complaint in this case alleges that Defendants' actions (including those of their agent, Macaw) violated the TCPA, as well as the statutes of states like Illinois that prohibit junk faxes as a misdemeanor.

52.     The "other cases" filed or prosecuted by Plaintiff's counsel against other defendants, as referenced in Ms. Abraham's letter to the Court, allege the same violation of the TCPA and various state laws.

53.     In seeking to prohibit the use by Plaintiff's counsel in those other cases of information obtained in this case and in other cases, Ms. Abraham is essentially asking the Court to find a protectable privilege applicable to Macaw's allegedly illegal activities.

54.     Well-established jurisprudence reflects a judicial unwillingness to extend the protections of privilege, or non-use and non-dissemination, to criminal activity.  *See, e.g., Heriot v. Byrne*, 257 F.R.D. 645, 657 (N.D. Ill. 2009) (Recognizing that the "crime-fraud exception," in which 'the attorney assist[s] his client to commit a crime or fraud" operates to forfeit any privilege asserted).

55.     Ms. Abraham's request to this Court is equally unavailing.

**IV.     What's Really Going On Here?**

56.     It appears that Ms. Abraham participated, either intentionally or unwittingly, in fax advertising transmissions that violated the TCPA.  Her activities in this regard are at the heart of several class actions pending against many of Macaw's former "customers."  Some of those "customers," now defendants in such actions, have instituted third-party claims against her.

57.     For example, the defendant in *Targin v. Preferred Chiropractic*, No. 09 C 1399, --

15

- F.Supp.2d ----, 2010 WL 198308 (N.D. Ill. Jan. 21, 2010) (Shadur, J.), fraudulently named Ms.

Abraham as a defendant in that case (by falsely claiming Abraham violated a contract by sending

junk faxes instead of junk mail) and then used that false pleading as a springboard to harass

Abraham with discovery requests.

58.     Ms. Abraham is unhappy about the fact that she is now joined in one or more

pending class actions about illegal activity in which she was tangentially involved.

59.     However, the fact that relevant and discoverable evidence obtained in this case,

and in the aforementioned *G.M. Sign* case, has assisted in the prosecution of other, similar class

actions against other defendants, with the result that Ms. Abraham herself has been joined as a

party in such other class actions, provides no basis for any relief to her in this Court.

**CONCLUSION**

WHEREFORE, Plaintiff requests that the Court strike Caroline Abraham's letter as

procedurally improper and substantively devoid of merit.  Alternatively, to the extent that the

Court views the letter as a request for an *ex post* protective order, Plaintiff contends that the letter

lacks any factual support or legal basis and, therefore, should be denied.

Respectfully submitted,

/s Phillip A. Bock
One of Plaintiff's Attorneys

Brian J. Wanca
Ryan M. Kelly
ANDERSON + WANCA
3701 Algonquin Road, Suite 760
Rolling Meadows, IL  60008
Telephone:  847/368-1500

Phillip A. Bock
Robert M. Hatch
Tod A. Lewis
Bock & Hatch, LLC
134 N. La Salle Street, Suite 1000
Chicago, IL 60602-1086
Telephone: 312/658-5500