**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CE DESIGN, LTD., an Illinois corporation
individually and as the representative of a class
of similarly-situated persons,

        Plaintiff,

v.

        Case No. 07 C 5456
        Judge Kennelly

CY'S CRABHOUSE NORTH, INC. and CY'S
CRABHOUSE & SEAFOOD GRILL, INC.,

        Defendants.

**DEFENDANTS' REPLY MEMORANDUM IN OPPOSITION**
**TO PLAINTIFF'S RESPONSE IN OPPOSITION TO ABRAHAM'S**
**"*EX POST* REQUEST FOR PROTECTIVE ORDER"**

NOW COME, Defendants, CY'S CRABHOUSE NORTH, INC. and CY'S

CRABHOUSE & SEAFOOD GRILL, INC., by and through their attorneys, and provide this

Reply Memorandum in counter to Plaintiff's Response in Opposition to what Plaintiff

characterizes as "Carolyn [sic] Abraham's Ex Post Request for Protective Order" (hereinafter,

"Plaintiff's Response").  In opposition, Defendants state:

**I.      INTRODUCTION.**

Plaintiff's counsel represented in writing to Caroline Abraham d/b/a Business to Business

Solutions ("B2B"), a *pro se* producing party, that he would keep her production of business

records confidential.  Specifically, he agreed that he would not disclose "*any* of the ***back-up***

***disks*** or ***hard drive*** to any third-party."  (Dec. 16, 2008 Email attached hereto as **Exhibit**

**A**)(emphasis added.)  This representation was in black-and-white and it is uncontroverted.  This

same plaintiff's counsel reiterated that protection in an email to defense counsel, instructing him

to keep the DVD in this case "confidential pursuant to the protective order in this case."  (June

23, 2009 Email attached hereto as **Exhibit B**.)  Abraham, unrepresented at the time Ryan Kelly made this accord with her, only produced these materials pursuant to the promise of an attorney. She was "permitted to rely on [his] promises and agreements."  *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 796 (7th Cir. 2009).  Yet, now, this same plaintiff's counsel asks this Court to turn a blind eye to the written pact and its Protective Order.  Such arguments fall flat. Without permission, plaintiff's counsel secretly used confidential information, the B2B DVDs and hard drive, to solicit entities to file TCPA class actions against B2B's customers and used that information as the cornerstone for expert reports in such actions.  Indeed, Abraham is not now making an "ex post request for protective order" but is, instead, asserting her rights under the existing Protective Order and confidentiality agreement.  (*See* Caroline Abraham Aff., ¶¶ 3-4, 11-12, attached as **Exhibit C**.)

## II.     BACKGROUND.

### A.     Abraham's Letter.

In her February 22, 2010 letter, Caroline Abraham detailed a history with plaintiff's counsel during which B2B handed over its proprietary records: the company's backup disks and hard drive.  (*See* Doc. #211 at 2-3.)  She was told by plaintiff's counsel that the materials would only be used in four cases (hereinafter, the "first four cases"), including the instant matter, and she was "assured that nobody would look at any other information on the disks and hard drive" that did not relate to these initial lawsuits.  (*Id.*; *see also* Abraham Aff., ¶¶ 3-4.)  Abraham "never gave permission for anyone to use any of the data on [B2B's] disks and hard drive, except for the data relating directly to the first four lawsuits."  (Doc. #211 at 2-3; Abraham Aff., ¶¶ 11-12.) She believes lawsuits have been initiated based solely upon the information her company produced.  (*Id.*)  She seeks an order: stopping the use of B2B's DVDs and hard drive in all but

the first four cases and against the use of this information in future lawsuits.  (*Id.*)

In response, plaintiff has argued that this letter is Abraham's "request for an *ex post* protective order."  (*See* Doc. # 219 at 5, 8.)  Plaintiff argues this "request" should be denied because:  Abraham did not comply with the Protective Order; she has no protectable interest in the DVDs and hard drive; Abraham waived the protections by asking her college son, living at home, to produce the subpoenaed materials; Abraham produced other materials that were not protected; and, the media cannot be protected given the purported criminal activity involved.

**B.     Events Preceding And Surrounding The Confidential Agreement.**

On September 16, 2008, Caroline Abraham's deposition proceeded pursuant to plaintiff's subpoena, which also requested production of "certain documents relating to Cy's Crabhouse." (Caroline Abraham Dep. at 12, attached hereto as **Exhibit D**.)  She produced bank records and database entries from her computer, which were "business record[s] that Business to Business Solutions would commonly use" to keep track of its customers.  (*Id.* at 13, 16.)     She was "putting data into the [database]" on a daily basis.  (*Id.* at 13-14.)  Ten exhibits at her deposition consisted of documents "retrieved from [her] computer that was used in the day-to-day business operations of Business to Business Solutions."  (*Id.* at 31.)  Her son, Joel, who lived with her and was a full-time student, could run the "zip code program" on the B2B computers.  (*Id.* at 92-93.) B2B had a "general policy" to maintain data regarding their "customers."  (*Id.* at 97.)[1]

On or about December 14, 2008, Caroline Abraham met with Ryan Kelly.  (Abraham Aff., ¶ 3.)  He asked that she produce the actual media for the faxing purportedly done with regard to the first four cases.  (*Id.*, ¶¶ 2-3.)  If she produced this media, he would keep the

---

[1] Thereafter, plaintiff's counsel instigated an action in the United States District Court for the Eastern District of New York.  (*See* Order to Show Cause, with David Paul Affidavit and Oct. 6, 2008 email, attached hereto as **Exhibit E**.)  The Court ordered Abraham to produce documentation requested in October 2008 correspondence by plaintiff's counsel.  (*Id.*)  B2B's DVDs and hard-drive were *not* the subject of the order.  (*Id.*)

material confidential; no one would look at anything beyond the four cases. (*Id.*)  Then, on December 16, 2008, Plaintiff's counsel represented this in writing.  He would not disclose "***any*** of the ***back-up disks*** or ***hard drive*** to any third-party."  (Exh. A)(emphasis added.)   Kelly attached a proposed Protective Order in another matter, *GM Sign, Inc. v. Finish Thompson*, a Protective Order substantively identical to the Protective Order in this matter.  (*See* Protective Order attached hereto as **Exhibit F**; *see also* Protective Order in *GM Sign, Inc. v. Finish Thompson* at 4-5, attached hereto as **Exhibit G**.)

Ryan Kelly served a one-page "Notice of Subpoenaed Deposition" for Joel Abraham's deposition on the very same day that Kelly assured Caroline Abraham that there would be no disclosure of "any of the back-up disks or hard drive to any third-party."  (*See* Dec. 16, 2008 Subpoena attached hereto as **Exhibit H**; *see also* Exh. A.)

Then, two weeks later, on December 30, 2009, without service on defendant, plaintiff's counsel subpoenaed from Joel Abraham production of B2B's "back-up disks and hard drive." (*See* Exh. 1 to Joel Abraham Dep., attached hereto as **Exhibit I**.)  This subpoena requested production on the date of his deposition in this case and referenced the court number for this case and the Northern District of Illinois.  (*Id.*)

Thereafter, plaintiff's counsel sent Caroline Abraham additional correspondence, asking when they could expect access to, or copies of, all backup discs and the hard drive.  (*See* Exh. B to Abraham Aff.)  Plaintiff's counsel instructed her that she could have Joel Abraham "bring all the backup discs and the hard drive with him to [his] deposition."  (*Id.*)

Pursuant to these representations and subpoenas, Caroline Abraham instructed her son to retrieve and produce information.  (*See* Joel Abraham Dep. at 9, 15-18.)  At his deposition on January 8, 2009, Joel Abraham testified that he had appeared for his deposition and produced a

DVD pursuant to subpoena and his mother's instruction.  (*Id.* at 8-9, 16-18.)  He was living with his parents at the time.  (*Id.* at 6.)  He followed his "mother's orders" and looked through the disks he had, which were "CDs and DVDs that are back-up disks" for the multiple computers that his mother had at their home.  (*Id.* at 9-10.)  He was the person who "attached" the computers to a "central hub" or "network."  (*Id.* at 11.)

Caroline Abraham relied upon these Ryan Kelly's representations.  (Abraham Aff., ¶ 4.) Although she did not have further discussions with him regarding this cloak of confidentiality, she took him at his word and believed that he would not disclose any of the back-up disks or hard drive to any third-party.  (*Id.*)  She understood that he would use the DVDs and hard-drive for the four cases pending at that time but believed there would be no dissemination outside of those four cases.  (*Id.*)  She had not been involved in backing-up the computers.  (*See id.*, ¶ 9.)

As of September 2009, plaintiff's counsel continued to maintain to Caroline Abraham that they were abiding by the agreement to limit dissemination of the electronic materials.  On September 11, 2009, plaintiff's counsel sent declarations for Abraham to sign regarding the DVDs and hard-drive.  (*See* Sept. 11, 2009-Oct. 19, 2009 Emails attached hereto as **Exhibit J**.) Plaintiff's counsel represented that these would be used in one of the first four cases, *CE Design Ltd. v. C & T Pizza*.  (*Id.* at 2.)  However, to the contrary, the declarations were not used in *CE Design v. C & T Pizza*; a declaration was instead used in another new case in Washington, which was launched on the basis of the confidential DVD from this case.  (*See* James K. Borcia Aff., ¶ 3, attached hereto as **Exhibit K**.)

## C.     This Court's Protective Order.

Part of Plaintiff's Response is that Caroline Abraham never "invoked the protections afforded" to her, never followed "a specific procedure" for designating information or materials

confidential, and therefore waived any right to confidentiality.  (Pl.'s Resp. at 3-4.)  However, the Protective Order belies these assertions.  It states:

> [A]ny party or third party that submits to the jurisdiction of this Court…who is required to produce documents or disclose information…may designate as 'confidential' any non-public material that the producing person believes, in good faith, contains information related to a trade secret, customer lists, non-public pricing information…or any other information subject to a legally protected right to privacy ("Confidential Information").

> [For any] information that has not been reduced to documentary form…[it] may be designated as 'confidential' by ***informing counsel for the parties in writing that it is 'Confidential Information.'***

> Confidential Information shall not be used for *any* purpose other than the defense or prosecution of this action.

(*See* Exh. F at 1-2)(emphasis added.)  The protective order in *GM Sign, Inc. v. Finish Thompson* contains the same language, except it specifies: "***electronic information*** that has not been reduced to documentary form…may be designated as 'confidential' by the party producing such information by informing counsel for the parties in writing…"  (Exh. G at 2)(emphasis added.)

Moreover, as for "waiver" of a claim of confidentiality, both protective orders provide:

> A party or any other person ***objecting to the designation of Confidential Information*** shall provide written notice of the objection to the designating party…Within fourteen (14) days after such objection, the parties and any other objecting person(s) shall confer in good faith in an [sic] effort to resolve the objections.  If such conference does not resolve the objection, then the designating person may apply to the Court…for a ruling…Failure of the designating party to apply for a ruling within twenty-eight (28) days of such a conference ***waives its right to confidentiality***…"

(Exh. F at 4-5; *see also* Exh. G at 4-5.)

This Court's Protective Order also provides remedies.  First, "the party responsible for having made such disclosure ***shall immediately procure the return*** of the material."  (Exh. F at 5)(emphasis added.)  "Upon demand of the producing party, all copies of any inadvertently produced document shall be returned forthwith, and such documents shall not be introduced into

evidence, or subject to production, in this or any other proceeding without the consent of the producing party." (*Id.* at 5-6; *see also* Exh. G at 5, containing the exact same language.)

Not only did plaintiff's counsel invoke this Protective Order in written communication to Abraham on December 16, 2008 and in email correspondence to defense counsel on June 23, 2009 regarding electronic media but plaintiff's counsel referenced the Court's Protective Order for defense counsel's treatment of the "list of fax numbers" produced by Caroline Abraham at her September 16, 2008 deposition.  (Dec. 30, 2008 Email attached hereto as **Exhibit L**.)

> **D.    Other Lawsuits Springing From The Misuse Of B2B's Electronic Media.**

Without Abraham's permission, plaintiff's counsel secretly used the confidential information on the B2B DVDs and hard drive to solicit entities to file TCPA class actions across the country against B2B's customers.   Numerous lawsuits throughout the country were filed beginning in the Spring of 2009 by the very same plaintiff's counsel commenced based upon the very electronic media that Ryan Kelly explained he would not disclose to any third parties.  (A list of some of the class action TCPA lawsuits, involving B2B, filed by plaintiff's counsel is attached as **Exhibit M**, along with the complaints.)   This electronic media has served as the foundation for Biggerstaff's expert reports in each action.

For illustrative purposes, consider: *UESCO Industries Inc. v. Poolman*.  This suit was filed in Illinois on or about April 21, 2009, based on a fax broadcast by B2B in March 6, 2006. Plaintiff's representative, James Martin, identified as the only person knowledgeable regarding the receipt of the subject fax, testified that the plaintiff only filed a lawsuit after it "received a [solicitation] letter from Anderson & Wanca [in] February 2009." (*See* James Martin Dep. at 8, attached hereto as **Exhibit N**.)  He had never seen a copy of the fax attached to the complaint until he was provided a copy of the fax by plaintiff's counsel in a solicitation letter. (*Id.* at 23-

31.)  Martin testified that the letter said: "It's come to our attention that you have received an illegal fax.  Is this something that you would like to proceed with?"  (*Id.* at 8.)  The advertisement—enclosed with plaintiff's counsel's letter and eventually attached as Exhibit A to the complaint—constituted the only copy of the fax in the plaintiff's possession.  (*Id.* at 23-31.)

Equally important, in yet another case, plaintiff's counsel disclosed an expert report authored by Biggerstaff based upon the B2B DVD labeled 060715 and the hard-drive. (Biggerstaff Reports in *Creative Montessori Learning Ctr. v. Ashford Gear LLC* without exhibits attached hereto as **Exhibit O;** *see also* Biggerstaff Report in *UESCO Industries Inc. v. Poolman* without exhibits attached hereto as **Exhibit P**.)  Biggerstaff stated that to the best of his knowledge the DVD and hard drive were produced in connection with the Cy's Crabhouse case. (Biggerstaff Dep. in *Creative Montessori Learning Ctr. v. Ashford Gear LLC* at 17-18, 44, 61-62, attached hereto as **Exhibit Q**.)  The fax transmission logs found on the hard drive and DVD serve as the cornerstone of Biggerstaff's opinion regarding the number of alleged successful transmissions sent by defendant in that matter.  (*See* Exh. O at 2 and 1 and Exh. P at 2.)

Another example of a TCPA lawsuit launched as a result of the misuse of the confidential B2B data is *BNS, Ltd. v. Redondo Family Chiropractic, Inc.*, where plaintiff avers a fax broadcast by B2B on October 9, 2005.  (*See* Exh. P to Def.'s Mot. to Dismiss; *see also* Exh. M hereto.)  There, the corporate representative could not identify the fax attached to the complaint as having been received by his company.  (William E. Iverson Dep at 10, 46 in *BNS, Ltd. v. Redondo Family Chiropractic, Inc.*, attached hereto as **Exhibit R**.)  Moreover, Biggerstaff's report in that case discloses fax transmission logs from the very DVD from the instant matter as the sole basis for his opinion regarding the number of alleged successful transmissions sent by defendant.  (*See* Exh. P to Def.'s Mot. to Dismiss.)

Otherwise: Biggerstaff recently estimated that there were over a hundred email communications between Ryan Kelly and him regarding TCPA matters which arose out of the electronic data provided by B2B. (Exh. Q at 7-9.) Many of the emails consisted of "PDF images or faxed images" taken from the DVDs. (*Id.* at 16-18, 20.) Biggerstaff also sent many emails to plaintiff's counsel with lists of names and addresses of persons or entities who received or may have received fax transmissions as indicated on the B2B DVDs. (*Id.* at 20.) He testified that he "retained" nothing—none of his email correspondence with Mr. Kelly. (*Id.* at 7, 10.) For their part, plaintiff's counsel has admitted to discarding, in the ordinary course of business, lists of names of persons who were sent solicitation letters in March 2009. (Brian Wanca Aff., ¶ 9, attached hereto as **Exhibit S**.)

## III.   ARGUMENT.

The facts are clear and unequivocal: Abraham is ***not*** making an "ex post request for protective order" but is instead alerting the Court to her confidentiality agreement with counsel and asserting her rights as a producing party under the existing Protective Order. Plaintiff's claim that the Protective Order was never triggered or that there is no "protected status as to the information and materials" so that plaintiff's counsel could utilize this proprietary information to launch lawsuits throughout the country, is untenable. These assertions are failed attempts to mask the undeniable and egregious abuse of the Protective Order.

### A.      Abraham Could Rely Upon Counsel's Promise Of Confidentiality.

A producing party "is permitted to rely on opposing counsel's promises and agreements." *Salmeron*, 579 F.3d at 796. In *Salmeron*, plaintiff's counsel posted a document on the Internet in breach of an oral agreement he had with opposing counsel to keep documents confidential. *Id.* at 789, 791. At the time of the public disclosure, this defendant had no protective order in place.

*Id.* at 791-92.

The Seventh Circuit upheld dismissal as a sanction for the unauthorized disclosures of documents meant to be kept confidential.  *Id.* at 798.  The Court found no merit to plaintiff's counsel's argument that if defendant wanted the protections of the protective order, it needed to stamp the documents "Confidential" and bring a motion to seek a confidential designation.  *Id.* at 793-94.  The letters accompanying defendant's document productions showed that defendant was seeking a confidential designation.  *Id.* at 793.  Moreover, the Seventh Circuit rejected the argument that since no protective order was in place disallowing the disclosure, counsel should not be sanctioned.  *Id.* at 795.  This ignored counsels' agreement into which plaintiff's counsel voluntarily entered.  *Id.*  As for any claim of fault on the part of the producing party for the absence of a protective order before production, the Seventh Circuit explained: this argument "essentially boils down to faulting [defendant's] lawyers for not protecting their client from an adversary who might not be trustworthy."  *Id.* at 795-96.  This was meritless because "[a]ttorney integrity is fundamental to the judicial process" and the "rules of conduct governing the profession prohibit lawyers from engaging in conduct that involves dishonesty and misrepresentation."  *Id.*

Here, at a minimum, Abraham was entitled to take counsel at his word when he agreed that he would not "disclos[e] any of the back-up disks or hard drive to any third-party."  *See Salmeron*, 579 F.3d at 796.  Plaintiff's counsel cannot, now, seek to avoid his confidentiality agreement with Abraham, which immediately preceded her production of private company information to plaintiff's counsel, in order to use this confidential information in breach of the agreement and violation of the Protective Order.  He made a promise of confidentiality, upon which Abraham relied, and an accord was reached.  This is sufficient under Seventh Circuit

precedent.

**B.      Under The Protective Order, The DVDs and Hard Drive Were Designated Confidential.**

Plaintiff's Response springs from a failed premise.  Abraham's letter is not a new summoning of this Court's Protective Order.  Instead, the Protective Order was properly referenced and abided by; Abraham did not need to take additional action to be afforded the protections of confidentiality; and, there is no indication by Ryan Kelly, an attorney, to Abraham that she needed to do anything more than rely on his promise.

The Protective Order is unambiguous and clearly restricts the production and use of the B2B DVDs and hard drive.  The Protective Order provides that electronic information may be designated as "confidential" by informing counsel for the parties in writing.  (*See* Exhs. F and G.)  It orders that Confidential Information shall not be used for any purpose other than the defense or prosecution of this action.  (*Id.*)  As for lack of timeliness or waiver of confidentiality, under the Protective Order, this issue arises only if someone objects to the designation of Confidential Information.  (Exhs. F and G at 4-5.)  If a party objects to the designation, he or she needs to provide written notice of the objection to the designating party and confer with the designating party; and, if the conference does not yield a resolution, the designating party should apply to the court for a ruling.  (*Id.*)  Only then, if the designating party fails to apply for a ruling could there be a potential waiver of the producing party's right to confidentiality.  (*Id.*)

The back up disks and hard drive, which was not produced by B2B in documentary form, had been designated "confidential" by counsel in writing.  (Exhs. A and B.)  From plaintiff's counsel's written designations, it is plain that this confidential label was affixed.  Moreover, at no time has any party or person challenged this confidential designation under the Protective Order's protocol.  (Exh. F at 4-5.)  Therefore, the mark of confidentiality that attached to the

DVDs and hard drive after the December 2008 written affirmation by plaintiff's counsel stands. This designation, never challenged by plaintiff's counsel, was simply disregarded by this same counsel for their own pecuniary and business interests.

        **C.**      **The Electronic Media Produced Are Properly Considered And Treated As *B2B's* Confidential Information.**

Plaintiff claims that B2B's production of electronic media—information Joel Abraham backed up at his mother's request—are Macaw's business documents regarding which Abraham has "no standing to seek judicial protection." This argument is fatally flawed.

First, no subpoena has ever been served on Macaw or Maxileads in this case. Second, by plaintiff's own admission, the subpoenas for production of the hard drive and DVDs were served on persons affiliated with B2B. Specifically, plaintiff's counsel served a subpoena on Joel Abraham for his deposition and for production of the "back-up disks and hard drive that contain information relating to any fax broadcasting by Business to Business Solutions." (*See* Exh. 1 to Joel Abraham Dep.) Third, the Abrahams both testified that the electronic information produced was taken from B2B's business computers, kept by Joel Abraham in the family's house. For her deposition, Caroline Abraham produced "business record[s] that Business to Business Solutions would commonly use" regarding its "customers." (Caroline Abraham Dep. at 13, 16.) She furnished documents used in B2B's day-to-day business operations. (*Id.* at 31.) Joel Abraham, testified that these "disks" were the back-up disks for the computers at their home. (Joel Abraham Dep. at 9-10.)

Finally, plaintiff's argument that plaintiff's counsel could manipulate the hard-drive and back up disks because B2B was "merely…a conduit through which another company, Macaw" operated defies logic. By extending this reasoning further: a party could seek and use an insurance company's confidential information by simply requesting the information from the

insurance broker or could avoid protections afforded to the proprietary information of a manufacturer by seeking the computer hard-drive and DVDs of back-up files maintained by its sole distributor.

**D.      The Electronic Media Produced Are Confidential Information.**

Moreover, there is a clear "basis for…protected status," contrary to plaintiff's assertions. (Pl.'s Resp. at 9.)  A private company maintained the computer data, which was particularized work for its customers, customer lists and information not disclosed until subpoenas and representations of confidentiality were made.  (*See* Abraham Aff., ¶ 8.)  They are proprietary information and trade materials.  (*See* Defs.' Reply Mem. in Support of Mot. to Dismiss at 7-8.)

**E.      Plaintiff's Response Raises a Series of Red Herrings To Be Rejected.**

Otherwise, Plaintiff's Response focuses on extraneous issues that have no bearing on Abraham's requested relief.  Plaintiff posits that by Joel Abraham producing the DVDs and hard-drive pursuant to subpoena and plaintiff counsel's urging, Abraham waived the "alleged protected status of the information and materials."  However, the only legal authority upon which plaintiff relies regarded whether documents were attorney client privileged communications or attorney work product and, if so, if there was a waiver of these privileges under the "Common Interest Doctrine."  *Allendale Mut. Ins. Co. v Bull Data Sys., Inc.*, 152 F.R.D. 132, 134-35 (N.D. Ill. 1993).  Moreover, even if Caroline Abraham's son was considered independent, the trade secret and other confidential information he provided was disclosed with Caroline Abraham's expectation of confidentiality and is, therefore, protected.  *Culinary Foods, Inc.*, 151 F.R.D. at 302.  She "does not waive any right to protection of these trade secrets" merely because the information is produced by a third party.  *Id.*

Also, the legal basis for plaintiff's claim that the "protections of privilege or non-use and non-dissemination" do not extend to "criminal activity" is similarly to no avail.  In *Heriot v. Byrne*, 257 F.R.D. 645, 657 (N.D. Ill. 2009), the Court considered whether the invocation of the attorney-client privilege applied to "communications made in furtherance of a crime or fraud outside the attorney-client privilege."  (Citations omitted.)  This case is inapplicable for numerous reasons, including: the claim of confidentiality, here, is not over communications between an attorney and client; and, in plaintiff's own words, these were "allegedly illegal activities" not obvious or known frauds or "criminal activity."[2]

Finally, Abraham's production of a small number of documents relating to Phoenix Communications in June 2009 did not constitute a waiver of the confidentiality.  Simply because a party produces a limited number of documents in discovery does not mean that such party has waived its rights of confidentially over the vast information stored on electronic media. Abraham did not access the DVDs or hard drive at any point—let alone for responding with limited documents to plaintiff's subpoena.  (Abraham Aff., ¶ 9.)  She was not computer savvy. (Caroline Abraham Dep. at 92-93.)  She did not access the fax listings or "logs" when responding to Kelly's requests for production in the summer of 2009.  (Abraham Aff., ¶ 10.) Instead, she still believed in June 2009 that Ryan Kelly was living up to his word and not disclosing data on the back-up disks or hard drive.  (*Id.*)

F.     **An Injunction Is Appropriate.**

Abraham "never gave permission for anyone to use any of the data on [B2B's] disks and hard drive, except for the data relating directly to the first four lawsuits."  (Doc. #211 at 2-3; Abraham Aff., ¶¶ 11-12.)   She believes lawsuits have been initiated based upon her company's

---

[2] Indeed, if defendants in this case or others can show consent, an established business relationship, or no fax transmission, then there has not been any violation of the federal statute, let alone any "criminal activity" or fraud.

information, and she seeks an order: stopping the use of B2B's DVDs and hard drive in all but the first four cases and an order against the use of this information in future lawsuits.  (*Id.*)

A district court has great discretion when deciding how to enforce violations of its own orders, including protective orders.  *Eagle Comtronics, Inc. v. Arrow Commun. Labs, Inc.*, 305 F.3d 1303, 1314 (Fed. Cir. 2002); *Coleman v. American Red Cross*, 979 F.2d 1135, 1141 (6th Cir. 1992)  A court can enjoin a "party or entity from committing acts elsewhere, particularly when it is necessary to preserve the integrity of the Court's own orders."  *Omnium Lyonnais D'Etancheite Et Revetement Asphalte v. Dow Chemical Co.*, 441 F. Supp. 1385, 1390 (C.D. Cal. 1977)(*citing Cole v. Cunningham*, 133 U.S. 107, 121 (1890)).  A court may even enjoin a party from using the fruits of a discovery violation in other proceedings.  *See Coleman*, 979 F.2d at 1141.  Courts may issue injunctions binding on non-parties when such non-parties' use of confidential information violates the court's protective order.  *See In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 422 (E.D.N.Y. 2007).

WHEREFORE, Defendants, CY'S CRABHOUSE NORTH, INC. and CY'S CRABHOUSE & SEAFOOD GRILL, INC., respectfully request that this Court:

1)   Find and declare that the DVD-ROM labeled "FAXING 060430" and the DVD-ROM labeled "FAXING (1,2,3) 060715" (the "DVDs") together with the Western Digital Hard Drive Model WD800BB-00KA0, serial number WCAHL6653150 (the "hard-drive"), constituted "Confidential Information" guarded from dissemination by this Court's Protective Order and the Confidentiality Agreement between plaintiff's counsel and Abraham;

2)   Grant the relief sought by Caroline Abraham, as allowed by the Protective Order, by issuing an order that all copies of the DVDs, hard-drive and related materials be returned to her and that these materials shall not be introduced into evidence or subject to production in any other current or future proceeding;

3)   Grant an order enjoining plaintiff's counsel and counsel associated with plaintiff's counsel from use of the DVDs or hard-drive in current or future lawsuits, arising under the TCPA and involving B2B, except in the first four cases;

4)      Grant an order requiring plaintiff's counsel to provide a copy of the Court's order
        in any pending or future lawsuit arising out of B2B fax broadcasts; and,

5)      Grant such other relief as this Court deems just and appropriate.

                                        Respectfully submitted,


                          By:      /s/ Molly A. Arranz
                                   Attorneys for Defendants

Eric L. Samore, ARDC # 6181345
Molly A. Arranz, ARDC # 6281122
SmithAmundsen LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601