**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CE DESIGN, LTD., an Illinois corporation individually and as the representative of a class of similarly-situated persons,<br><br>        Plaintiff,<br><br>v.<br><br>CY'S CRABHOUSE NORTH, INC. and CY'S CRABHOUSE & SEAFOOD GRILL, INC.,<br><br>        Defendants. | <br><br><br><br><br><br>Case No. 07 C 5456<br>Judge Matthew F. Kennelly |

**DEFENDANTS' RESPONSE TO
PLAINTIFF'S DECLARATIONS AS TO FINANCIAL ARRANGEMENTS**

NOW COME, Defendants, CY'S CRABHOUSE NORTH, INC. and CY'S CRABHOUSE & SEAFOOD GRILL, INC., pursuant to leave of this Court and by and through their attorneys, and respectfully submit this Response to Plaintiff's Declarations as to Financial Arrangements.

**I.    PROCEDURAL HISTORY.**

In Plaintiff's Response to Defendants' Motion to Dismiss, plaintiff simply explained that a $5,000 check made out to an attorney, Eric Rubin, from plaintiff counsel's personal checking account "had nothing to do with this case" and "was returned, so it obviously does not show any influence on [Caroline] Abraham." (Doc. #232 at 13.) Plaintiff did not provide any other explanation for the offer.

On June 11, 2010, this Honorable Court issued a Memorandum Opinion and Order, which made certain findings regarding Defendant's Motion to Dismiss pursuant to Rule 37(b)(2)(A) and a letter from Caroline Abraham, a non-party to this suit, which letter this Court

treated as a Motion for Protective Order. (Doc. # 260 at 1.) In this opinion, the Court required that the plaintiff's counsel produce evidence regarding the $5,000 check made payable to Eric Rubin from Brian Wanca. (*Id.* at 18-19.) The Court was "troubled by the attempted payment" and had "serious concern about the propriety of an attempted payment to a non-party in exchange for compliance with discovery requests, particularly in light of the fact that this was not disclosed to the other side." (*Id.*) Since "CE Design's brief on the present dispute is rather deafeningly silent regarding the attempted payment [to Rubin], its purpose, and the surrounding circumstances," the Court directed "counsel for CE Design to submit to the Court a sworn explanation by each counsel of record describing any past or current financial arrangement, and any financial arrangement that was proposed or suggested but never executed between plaintiff or plaintiff's counsel and Caroline Abraham, Joel Abraham, B2B, or their counsel." (*Id.* at 19.)

On June 25, 2010, plaintiff's counsel filed sworn statements. (*See* Docs. # 262, 264, 266 and 267.) Prior to this submission, Eric Rubin had provided his deposition in another TCPA matter, *Creative Montessori Learning Ctr. v. Ashford Gear*, Case No. 09-cv-03963 (N.D. Ill.)(Gettleman, J.), which matter involves the same plaintiff's counsel and the same defense counsel. Also prior to this submission, Caroline Abraham provided her deposition in another TCPA matter, *Reliable Money Order, Inc. v. McKnight Sales Co.*, Case No. 2:10-cv-00242-WEC (E.D. Wis.)(Callahan, J.), which is another case involving the same counsel. (Eric Rubin Dep. attached hereto as **Exhibit A**; Caroline Abraham Dep. attached hereto as **Exhibit B**.)

II.   **FACTUAL BACKGROUND.**

   A.   **The Plaintiff's Counsel's Declarations.**

Plaintiff's counsel submitted declarations. Brian Wanca provided the most detailed affidavit. He explains his background in dealing with payment for subpoenaed records and

compensation for time, stating: "Based upon my past dealings with computer specialists, I believe a fee of $500 is a standard rate and may go higher if there is a large server or hard drive which needs to be imaged." (Wanca Decl., ¶ 4.) Apparently because of this, plaintiff's counsel sent a check in the amount of $500.00 made payable to Joel Abraham as reimbursement for his time and expense in imaging *the hard drive* of B2B's computer. (*Id.*, ¶ 11)(emphasis added.)

Then, Wanca avers that plaintiff's counsel determined that they "believed that it would be best to take possession of the [B2B] computer(s) to retrieve the data ourselves at our own time and expense." (*Id.*, ¶ 12.) "It was my understanding that the Abrahams sought to be compensated for turnover of the computer and loss of use of that computer." (*Id.*) He "had no communications with Eric Rubin or the Abrahams…[but] while traveling with [his] family, in August of 2009, [he] sent a check in the amount of $5,000…to Rubin for 'document retrieval.'" (*Id.*) This payment was: "to reimburse Caroline or Joel for retrieving documents on cases that [Ryan] Kelly requested documents on, for sitting for future depositions/sworn statements, and for turnover of the computer and to compensate for loss of use of the computer." (*Id.*)

Ryan Kelly's Declaration provides a similar explanation. He states: "[w]e anticipated seeking documents and testimony for other TCPA cases (not this one) in the future and believed that it would be best to take possession of the computer(s) to retrieve the data ourselves." (Kelly Decl., ¶ 2.)

    **B.**    **Eric Rubin's Deposition Testimony.**

Eric Rubin testified regarding his August 12, 2009 letter, which was marked as Exhibit 3 for his deposition, and the related documents, including Wanca's handwritten reply on the August 12, 2009 letter, which was marked as Exhibit 4. (Eric Rubin Dep. at 50-76, 105-123, 169-170; *see also* Exhibits 3 and 4 thereto.)

Rubin testified as to his conversations with both Brian Wanca and Ryan Kelly as reflected in the August 12, 2009 letter. He stated that he had a short, two-minute conversation with Wanca prior to the $5,000 check being tendered. (Rubin Dep. at 51-52.) Later, pursuant to questioning by plaintiff's counsel, who produced, for the first time, email correspondence between Wanca, Kelly and Rubin, Rubin admitted that Wanca's cell phone number had been provided to him in early August 2009, with the explanation that Wanca had been told about "all matters that [Kelly and Rubin] have discussed." (*Id.* at 105-108; *see also* Exh. D thereto.) On August 4, 2009, Rubin was directed to "call Brian [Wanca]" on his cell phone. (*See id.*)

Receiving the $5,000 check on August 12, 2009 was "unusual" as Rubin "normally [did not] get personal checks from other lawyers for $5,000 or for any amount." (Rubin Dep. at 54.) Actually, Rubin testified that he considered the tendering of a $5,000 personal check of "questionable propriety" because: "[he] regarded this as a check made out to [him] to induce [him] to convince Mrs. Abraham to go further and give [plaintiff's counsel] additional information." (Rubin Dep. at 109-110.) "[A]s a lawyer, [he] would construe [the payment] in the most strict way," and construing the check in this fashion: he thought that "Mr. Wanca wanted [him] to put $5,000 in [his] own pocket as a payoff." (*Id.* at 110, 117.) He drew the inference that that was what was happening because "it [was] so highly irregular and so unprecedented." (*Id.* at 111.) Characterizing it as "of questionable propriety" was Rubin "trying to be kind." (*Id.*) He conferred with one of his partners regarding the check and "the unusual nature of the way it came" and he "pulled some punches" in the letter. (*Id.* at 112-113.)

He explained that the "proposal" by plaintiff's counsel was to: "put [Caroline Abraham] on some sort of retainer." (*Id.* at 121.) "[I]t was Caroline Abraham's sort of retention of her [being] proposed" and he had "rejected that." (*Id.* at 169-170.)

### C. Caroline Abraham's Testimony.

In another TCPA matter, Caroline Abraham testified regarding her financial relationship with plaintiff's counsel. (*See* Abraham Dep. at 21-26.) She stated:

> They always gave me checks every time I provided evidence. Okay, I've gone through some trouble sometime to do the work to get that evidence. So, paying me for my time seems reasonable. But then later it turned into bigger amounts for cases that apparently were not yet pending. And I thought these were more in the nature of bribes. And I didn't think it was right to continue to cash in such checks, or continue to cash any of the checks.

(*Id.* at 23.) According to plaintiff's counsel's own records, from July 2, 2009 to September 16, 2009, she did not accept any payment from plaintiff's counsel. (Doc. #262-6.)

## III. ARGUMENT.

The plaintiff's declarations regarding the "past or current financial arrangement and any financial arrangement that was proposed or suggested" is deficient. These defendants provide this Response Memorandum as the proposed, financial arrangements impact the continued assessment of the properness of this case proceeding as a class action and the evidence to be presented in this matter.

### A. The Inconsistencies Regarding What The Financial Arrangements Were Continues.

Six months after B2B had produced its hard drive to plaintiff's counsel, only, Eric Rubin sent correspondence to Brian Wanca in which he referred to "a check in the amount of $5,000 made out to [Rubin] personally that [he] received from [Wanca] [by] fed ex." (Aug. 12, 2009 Letter attached as Exhibit 3 to Rubin Dep.) Rubin explained that he had told Ryan Kelly that he "regard[ed] this attempt to pay [his] client for their cooperation in providing…information or documents identifying third parties that may have sent fax transmissions through Business to Business at the very least, to be of questionable propriety." (*Id.*) He further stated: "I never gave

[Brian Wanca] any indication that the arrangement that [Wanca] proposed was acceptable to my client." (*Id.*) He also added: "I resent the fact that you would send a check made out to me as payee in a Ramada Inn envelope unaccompanied by any cover letter explaining the precise purpose other than cryptic notation 'document retrieval.'" (*Id.*) The check itself simply states "Document Retrieval" and no correspondence was included.

Then, at his deposition, Rubin testified that he had pulled some punches in writing this letter and was "trying to be kind." (Rubin Dep. at 111-113.) When pushed by plaintiff's counsel for the real meaning behind his words, Rubin explained that "[he] regarded this as a check made out to [him] to induce [him] to convince Mrs. Abraham to go further and give [plaintiff's counsel] additional information." (Rubin Dep. at 109-110.) He believed this was highly irregular and unprecedented. (*Id.* at 111.) The "proposal," as referenced in his letter, was that Caroline Abraham be put on some sort of retainer. (*Id.* at 121.) Concisely, he explained that he had received a Ramada Inn envelope and a personal check from plaintiff's counsel, which signified a request for a "sort of retention" of Caroline Abraham. (*Id.* at 169-170.)

For its part, plaintiff's counsel makes contrary averments as to what the leap to $5,000 in attempted payment to Rubin meant. Counsel explains that checks were made out to Caroline Abraham and Joel Abraham for document retrieval and that a larger check—in the amount of $500—was made payable to Joel Abraham for tendering of the hard-drive for the B2B computers. (*See* Wanca Decl., ¶ 11.) Indeed, by plaintiff's counsel's own accounting the tally of payments made to Caroline Abraham, which seventeen (17) checks she actually cashed, totaled $1,110, only, over the span of July 14, 2008 through September 16, 2009. (*See* Doc. #262-1.) Instead of her requesting and then actually receiving thousands of dollars in one lump sum, she typically received smaller checks in the amounts of $35 or $50, which amounts totaled just over

a thousand dollars. (*See id.*) Plaintiff's counsel sent Caroline Abraham nineteen (19) checks, which she did not cash. (*See id.*)

Then, plaintiff's counsel explains a new reason for the $5,000 personal check made out to Eric Rubin, personally. Counsel "believed that it would be best to take possession of the computer(s)" and sought to compensate the Abrahams for "turnover of the computer and loss of use of that computer." (Wanca Decl., ¶ 12.) However, the notation on the check, letter by Rubin, and testimony to date show otherwise. Plaintiffs have produced no documentary evidence or emails indicating that they requested that the Abrahams provide them with the computer. Indeed, the subpoenas served on Joel Abraham enumerate requests for production of the hard-drive and back-up DVDs, only. The deposition testimony, sworn statements and emails do not identify any conversations with the Abrahams or Rubin in which counsel requested turning over the computer. Also, plaintiffs produce no documentary evidence or oral testimony that Caroline or Joel Abraham requested payment of such a large sum in one check. Counsel provides no logical explanation for the attempted payment consistent with the undisputed evidence and documentation.

Wanca also claims that he "had no communications with Eric Rubin" in this regard, even though Rubin had testified to the contrary weeks before Wanca's Declaration was submitted and even though the August 12, 2009 letter explains otherwise. (*See* Wanca Decl., ¶ 12; Rubin Dep. at 51-52, 105-108; Exhs. 3 and D to Rubin Dep.) The very emails, produced by plaintiff's counsel at Rubin's deposition, show Wanca's cell phone number being provided to Rubin in the days leading up to the sending of the check. (*See* Exh. D, attached to Rubin Dep.) Further, plaintiff's counsel provides no explanation as to why the personal check was made payable to Eric Rubin, personally, as opposed to his law firm, for example.

**B. The Financial Arrangement Impacts The Continuing Assessment Of The Class Proceeding.**

These financial arrangements go toward the Court's consideration of the case as a whole. For instance, to determine whether counsel should be disqualified, "'a court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel.'" *Wagner v. Lehman Bros.*, 646 F. Supp. 643, 659-60 (N.D. Ill. 1986)(citing *Woods v. Covington County Bank*, 537 F. 2d 804, 810 (5th Cir. 1976)). "[C]ourts should not shrink from their duty to order a party's attorney disqualified;" and, "while the moving party bears the burden of establishing grounds for disqualification, in determining whether disqualification is warranted, all doubts must be resolved in favor of disqualification." *Ward v. Nierlich*, Case No. 99-14227, 2006 U.S. Dist. LEXIS 97373, *23 (S.D. Fla. 2006).

In this respect: "A lawyer shall not pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case." *Wagner*, 646 F. Supp. at 656. Even if counsel never intended that money actually change hands, this "makes no difference…because the effect on the potential witness is the same: he is induced by the promise of potential payment to give testimony." *Id.*; *see also In re Kien*, 69 Ill. 2d 355, 372 N.E.2d 376 (Ill. 1977)("We will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise."); *Ward*, 2006 U.S. Dist. LEXIS 97373 *13- at *14 (S.D. Fla. 2006)(a lawyer shall not offer an inducement to a witness, which prohibition applies with equal force to payment for *truthful* testimony as to payment for false testimony) (emphasis in original.)

Moreover, such actions have an effect on the integrity of the judicial system. *Wagner*, 646 F. Supp. at 656. Indeed, "federal courts have the inherent authority to protect the integrity of the judicial process and to sanction Plaintiffs and their counsel for the abuse of that process." *Ward*, 2006 U.S. Dist. LEXIS 97373 at *11 (considering the behavior of plaintiffs in paying one lump sum of $5,000 to witnesses for "a promised stake" in the litigation and a promise of "'testimonial cooperation'"). Quoting the Florida Supreme Court, the *Ward* Court explained that the "very heart of the judicial system lies in the integrity of the participants…Justice must not be bought or sold." *Id.* at *16-*17.

Also, in the class action arena, the class counsel stands in a special position to the class, and this relationship requires examination of the plaintiff's counsel's conduct. Plaintiff's counsel has fiduciary obligations to be considered when counsel seeks to represent the class. *Wagner*, 646 F. Supp. at 661. "Where there is reason to doubt counsel's ability to meet those duties, class certification must be denied." *Id.*; *see also Stavrides v. Mellon Nat'l Bank & Trust Co.*, 60 F.R.D. 634, 636 (W.D. Pa. 1973)("unethical conduct by plaintiffs' counsel may result in a denial of the class action motion.") The *Wagner* Court explained that an inquiry into the character of counsel for the class-representative is necessary because he stands in a fiduciary relationship with the absent class. *Wagner*, 646 F. Supp. at 661 (citations omitted.) "In the majority of the reported decisions, examination of counsel's character focuses on his ethical behavior and the attorney's professional responsibility." *Id.* (citations omitted.) "Reference to counsel's unethical and improper actions is sufficient to find that he cannot adequately represent the putative class in accordance with his fiduciary duties." *Id.* "[C]lass action status should be denied where counsel's unethical conduct has been or is prejudicial to the interests of the class,

or results in creating a conflict of interest between the attorney and the class and the attorney is, therefore, obviously unable to protect the interests of the class." *Stavrides*, 60 F.R.D. at 636-37.

Here, Eric Rubin, a lawyer who has practiced in both the private and public sectors for thirty-five years, testified that he believed that the $5,000 personal check that he received from plaintiff's counsel was meant to induce him to convince his then-client to "go further" and provide plaintiff's counsel "additional information." (Rubin Dep. at 8-11, 109-110.)[1] He concluded that the "proposal" by counsel was to put Caroline Abraham on some sort of retainer. (*Id.* at 121, 169-170.) He had spoken to plaintiff's counsel and had received the personal check, without cover letter, in a Ramada Inn envelope in the days leading up to his conclusions about what was being sought. (*See id.* at 51-52.) "[A]s a lawyer, [he] would construe [the payment] in the most strict way," and interpreting the payment in this fashion: he thought that "Mr. Wanca wanted [him] to put $5,000 in [his] own pocket as a payoff." (*Id.* at 110, 117.)

On July 2, 2009, plaintiff's counsel made out twelve (12) separate $100 checks to Caroline Abraham for "document production" or "witness fee[s]" or statements; but, Abraham did not cash any of these checks. (*See* Doc. #262-1.) In her recent deposition, this non-party explained that the checks "later…turned into bigger amounts for cases that apparently were not yet pending." (Abraham Dep. at 23.) She "thought these were more in the nature of bribes" and did not cash the checks. (*Id.*)

Plaintiff's counsel explains that they already paid $500.00 to Joel Abraham for his making an image of B2B's computer; they had sent checks to Caroline and Joel Abraham from July 10, 2008 to April 20, 2009, which, with two exceptions, did not exceed $100 and typically totaled only $35 or $50. (Wanca Decl., ¶¶ 7, 11; *see also* Doc. #262-1.) The $5,000 check is not

---

[1] Illinois Rule of Professional Conduct 8.4 provides that an attorney shall not "induce another to engage in conduct . . . when the lawyer knows that conduct will violate these Rules."

included on the tally provided.  (*See* Doc. #262-1.)  Although the check made out to Rubin notes "document retrieval" and the prior documentary evidence and testimony makes no mention of such an effort, plaintiff's counsel now claims this check was to compensate the *Abrahams* "for turnover of the computer and loss of use of that computer." (Wanca Decl., ¶ 12; *see also* Kelly Decl., ¶ 2.)

The actual, financial proposal in this case should be considered in the Court's continuing assessment of the plaintiff's counsel's fiduciary relationship in this class action and appropriate sanctions.  *See Wagner*, 646 F. Supp. at 661.  The totality of the circumstances—including an "examination of counsel's character" such as the attorney's behavior and professional responsibility—goes toward whether the plaintiff's counsel can adequately represent the putative class and whether other sanctions are appropriate.  *See id.*; *see also Stavrides*, 60 F.R.D. at 636-37.  In another Northern District of Illinois case, the Court admonished: "A lawyer shall not pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case."  *Wagner*, 646 F. Supp. at 656.  The Illinois Supreme Court has counseled: "We will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise."  *In re Kien*, 69 Ill. 2d at 361-62.  Therefore, this legal precedent applied to the facts of this case show that sanctions, including disqualification of the law firm of Anderson + Wanca from this matter, are appropriate.  In addition, the defendants will be requesting that the class be decertified not only because of the conduct described herein but also due to the reasons to be set forth in the Defendants' Memorandum to be filed regarding the "Plaintiff's Submission Regarding Use of B2B Materials," which brief will demonstrate the deliberate withholding of a crucial piece of

evidence—B2B's hard-drive—for more than one year, which conduct has prejudiced the defense.

  WHEREFORE, Defendants request the following relief:

1)  Disqualification of the Anderson + Wanca law firm;

2)  Decertification of the class; and/or

3)  Such other relief as this court deems just and appropriate under Federal Rule of Civil Procedure 37 or 28 U.S.C. Section 1927.

                   Respectfully submitted,


              By:  /s/ Eric L. Samore
                   Attorneys for Defendants

Eric L. Samore, ARDC # 6181345
Molly A. Arranz, ARDC # 6281122
SmithAmundsen LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200
COUNSEL FOR CY'S CRABHOUSE NORTH, INC.
And CY'S CRABHOUSE & SEAFOOD GRILL, INC.