# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CE DESIGN LTD., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 07 C 5456 |
| CY'S CRABHOUSE NORTH, INC. and CY'S CRABHOUSE & SEAFOOD GRILL, INC., | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

CE Design Ltd. (CE Design) has sued Cy's Crabhouse North, Inc. and Cy's Crabhouse & Seafood Grill, Inc. (collectively, Cy's Crabhouse), alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b)(1)(C). On June 11, 2010, this Court issued a decision denying defendant's motion to dismiss and ordering a further hearing on certain alleged discovery violations and alleged payments made by plaintiffs' counsel to a third party witness.[1] The parties have submitted voluminous filings in advance of that hearing. The Court has concluded that these filings present sufficient information to allow the Court to rule without the need to conduct a hearing. The Court's findings are below.

---

[1] *See CE Design Ltd. v. Cy's Crabhouse North, Inc.*, No 07 C 5456, 2010 WL 2365162 (N.D. Ill. Jun. 11, 2010).

## Background

Business to Business Solutions (B2B), a business based in New York and run by Caroline Abraham (Abraham), worked for Macaw (also known as Maxileads), a Romanian company, to send fax advertisements in the United States. Abraham was B2B's only employee, but her son Joel Abraham (Joel) sometimes helped her with technical aspects of the business. According to Abraham, database records for B2B indicate that Cy's Crabhouse purchased two sets of 5,000 fax advertisements for a total of $328 on November 1, 2005. In November 2005, CE Design received an unsolicited fax advertisement for Cy's Crabhouse; that advertisement is the basis of this lawsuit.

A class was certified on July 27, 2009, and the case is currently set for trial on September 13, 2010. On March 29, 2010, Cy's Crabhouse filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 37(b)(2) for alleged discovery violations. Cy's Crabhouse argued that the case should be dismissed because plaintiff's counsel had violated discovery obligations by failing to turn over to the defense a copy of a B2B hard drive that included information about fax clients, e-mails, and logs recording sent faxes. Cy's Crabhouse also alleged that plaintiff's counsel used information from the hard drive to initiate new TCPA lawsuits against other former B2B customers in violation of a protective order entered in this case. Cy's Crabhouse further alleged that plaintiff's counsel had improperly attempted to influence Caroline Abraham's participation in the discovery process by sending her attorney a check for $5,000. Abraham herself sent a letter to the Court complaining about plaintiff's counsel's use of the information from the hard drive to initiate new TCPA lawsuits. The Court treated this letter as a motion for protective order.

On June 11, 2010, the Court issued a decision denying the motion to dismiss. The Court also ordered a further hearing to address plaintiff's counsel's use of the B2B materials to initiate other lawsuits and ordered plaintiff's counsel to submit sworn statements explaining the $5,000 check that plaintiff's attorney Brian Wanca sent to Caroline Abraham's attorney. In advance of that hearing, the parties have submitted voluminous filings. As indicated earlier, the Court has determined that these filings present sufficient information for the Court to rule without holding a further hearing.

## Discussion

### A. Alleged violation of the protective order

On July 2, 2008, the Court entered an agreed protective order in this case. It states:

> [A]ny party or third party that submits to the jurisdiction of this Court for adjudication of production and designation disputes who is required to produce documents or disclose information in discovery in this case (the "Producing Person") may designate as "confidential" any non-public material that the producing person believes, in good faith, contains information related to a grade secret, customer lists, non-public pricing information, personal consumer information, including social security numbers or consumer credit report, confidential research or any other information subject to a legally protected right to privacy ("Confidential Information").

*See* Docket no. 81. To designate material confidential, the protective order required the producing person to mark or stamp it "confidential" (in the case of documents) or inform counsel for the parties in writing that it is confidential (for any material not reduced to documentary form). Plaintiff's counsel argue that they did not violate the protective order when they used materials from the B2B hard drive to initiate new lawsuits because Abraham had failed to designate those materials confidential when she turned

them over.

In its June 11 decision, the Court noted that plaintiff's counsel had represented to Abraham that the material would be treated as confidential and subject to a protective order. The Court ruled, however, that Cy's Crabhouse had not shown that it suffered any prejudice as a result and therefore declined to dismiss the case on this ground. The Court stated that it was nonetheless concerned regarding the alleged misuse of the B2B materials, and ordered a "further hearing to determine how the materials from B2B have been used and the rationale supporting such use." Docket no. 260 at 13. *CE Design*, 2010 WL 2365162, at *7.

As the Court has indicated, Abraham had also sent a letter to the Court complaining about plaintiff's counsel's use of the B2B hard drive materials to initiate other cases. The Court treated this letter as a request for a protective order. The Court found that although the protective order it had entered stated that requests for confidentiality should be made at the time of disclosure, there was good reason for the delay – namely, that Abraham had been given reason to believe by plaintiff's counsel that the materials were already designated confidential or would be so designated. The Court ruled that "going forward, the documents, disks, and media containing B2B customer information and fax lists shall be treated as 'confidential' as defined by the protective order." *Id.* at *9. As a result, both sides were precluded from using the information on the hard drive for any purpose other than the defense or prosecution of this action. *Id.*

In advance of the anticipated hearing on the use of B2B materials, plaintiff's counsel have submitted a statement to the Court. In it, they again argue that the

4

materials on the B2B hard drive were not confidential under the protective order because Abraham did not follow the process established in the protective order for designating materials confidential. This argument is no more availing now than it was when the Court originally ruled on it.

Plaintiff's counsel also argue, however, that those materials are not eligible for confidential designation under the protective order because there is no good cause to keep them confidential. In order for materials to eligible for confidentiality under a protective order, a court must make a determination that there is "good cause" to keep those materials confidential. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944-45 (7th Cir. 1999). Courts may make or accept categorical confidentiality designations or stipulated protective orders, provided that such orders expressly state that either party can "challenge the secreting of particular documents." *Id.* at 946.

The protective order in this case was a stipulated order. It provides a process for challenging the confidentiality of a particular document or piece of discovery. Strictly speaking, CE Design has not followed that process. Because, however, the materials in question were officially designated confidential not by Abraham but by this Court's June 11 order, the Court will treat CE Design's filing as a challenge to the confidentiality of these particular materials.

Abraham has responded to CE Design's filing with a letter, which the Court invited. She identifies four reasons she believes there is "good cause" to designate the hard drive materials confidential: the computer material in question is her property; she wants to stop third-party lawsuits that have been filed against her as a result of the new

lawsuits plaintiff's counsel has filed; she does not like seeing her old customers suffer as they are named as defendants in new lawsuits; and she finds burdensome the process of appearing for multiple depositions in the many TCPA cases plaintiff's counsel has filed.

For purposes of its analysis, the Court accepts that all of what Abraham says is true. Abraham's contentions, however, do not constitute the kind of "good cause" that justify keeping the materials confidential. The discovery process by definition involves giving materials that are one's own property to others. As a result, the fact that Abraham is the owner of the hard drive at issue is insufficient to justify keeping it confidential. Nor does Abraham's frustration with the litigation to which she and her former customers are now being subjected justify designating the materials confidential. As CE Design points out, Abraham herself has admitted that B2B is no longer functioning as a business. Thus, there is no risk that disclosure of customer lists could give competitors an unfair advantage or insight into the workings of her business. Nor is there any allegation that the materials contained on the hard drive contain any kind of trade secret as the law defines that term. The Court concludes that neither Abraham nor Cy's Crabhouse has demonstrated good cause for keeping these materials confidential. The Court therefore vacates its earlier ruling designating them as such.

**B.     Failure to turn over the hard drive**

In its motion to dismiss, Cy's Crabhouse alleged that in February 2009, CE Design received a hard drive from B2B that contained information relevant to this case, including customer lists, fax logs, and records of e-mails sent between B2B and Macaw. It argued that the failure to produce these materials violated CE Design's discovery

obligations, justifying dismissal of the case. CE Design argued that the omissions were inadvertent and that the information that was not produced had no probative value.

In its June 11 decision, the Court ruled that the failure to disclose the e-mails amounted to *de minimus* non-compliance. Though the failure to turn over the hard drive was "somewhat more substantial," defendants had obtained access to the hard drive through their expert in January 2010, and they had failed to demonstrate any prejudice that had resulted from the delay in receipt. The Court gave defendant permission to file an additional expert report by July 10, 2010, in the event their expert's opinion changed based on the contents of the hard drive. The Court ordered a further hearing "to determine how the materials from B2B have been used and the rationale supporting such use." *Id.* at *7.

Cy's Crabhouse made a further submission following the June 11 decision. It states that after that decision its expert examined the B2B hard drive and that what he found materially changed his view of the case. Specifically, CE Design's expert, David Canfield, found emails and other documents on the hard drive that he contends suggest that B2B may have made modifications to the software reporting mechanism that generated the fax logs. B2B used a program called HylaFax to send the fax advertisements. The logs generated by the HylaFax program indicate how many faxes were sent, how many were successfully transmitted, and how many failed. According to Cy's Crabhouse, the newly-discovered documents on the hard drive suggest that B2B may have configured HylaFax to report a "success" even if a particular fax had not gone through all of the stages required for successful transmission to the recipient fax machine.

7

To be clear, Cy's Crabhouse does not allege that the evidence on the hard drive shows that B2B *did* modify the program to create false success reports; rather, it argues that there are e-mails that refer to technical difficulties and configuration files that have multiple versions, which in Canfield's view suggest that the program *might* have been modified. This, Cy's Crabhouse argues, is evidence that it would have presented when the Court was considering the motion to certify the class if the hard drive had been available. In opposition to class certification, Cy's Crabhouse argued that some of the fax numbers that are designated as successes on the fax logs may not have actually received the fax. This newly-revealed evidence, Cy's Crabhouse argues, would have bolstered that argument.

Cy's Crabhouse argues that both plaintiff's counsel and plaintiff's expert purposefully withheld the B2B hard drive because they did not want Cy's Crabhouse to have access to this information during the class certification proceedings in this case. Cy's Crabhouse argues that plaintiff's counsel failed to disclose the hard drive as part of discovery and that plaintiff's expert deliberately did not mention the existence of the hard drive when he was deposed in this case in May 2009, even though by that point he had possessed the drive for several months and had spent many hours analyzing it. Cy's Crabhouse argues that these discovery violations justify disqualifying plaintiff's counsel, barring plaintiff's expert, and decertifying the class.

According to Cy's Crabhouse, this information "impact[s] the class-wide, factual inquiry and demonstrate that there is no predominance of common issues and no superiority of the class mechanism, as individual questions pertinent to element of receipt require separate investigations into each class member's claim." Def.'s Resp. to

Pl.'s Submission Re: Use of B2B Materials (Docket no. 295) at 9.  The Court disagrees.
Cy's Crabhouse made this same argument during the briefing on the motion for class
certification.  As the Court noted in its order certifying the class, "even assuming proof
of receipt is required, defendants' argument does not carry the day. . . . Plaintiff has
provided circumstantial proof of receipt by all of the numbers to which the fax logs
indicate faxes were successfully sent on behalf of Cy's Crabhouse.  This is sufficient."
*CE Design v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 142 (N.D. Ill 2009).  This
new evidence that Cy's Crabhouse cites does not change this analysis.  The class is
defined as "all persons and entities who on November 1, 2005 and/or November 9,
2005 received a fax stating 'We Love To Serve You at Cy's Crabhouse,' listing Cy's
Crabhouse, 301 N. Milwaukee Ave. Buffalo Grove, IL."  Though it is possible that some
of the fax numbers that the logs indicate as having received the faxes actually did not,
there is nothing that suggests that all of the 7,295 transmissions listed in the log as
"error-free" were in fact unsuccessful.  Even if a significant proportion of the numbers
were false positives – a proposition the record does not support – there are still
hundreds or thousands of transmissions that were successful, more than enough to
meet Rule 23(a)'s numerosity requirement.  In addition, the class is still defined as
including only those who received the fax.

To the extent that there is an issue about the accuracy of the fax logs
themselves, that goes to the weight of the evidence, an issue appropriately addressed
at trial.  See *Holtzman v. Turza*, No 08 C 2014, 2009 WL 3334909, at *3 (N.D. Ill. Oct.
14, 2009).  Cy's Crabhouse may be attempting to argue that it will be too difficult to
determine who actually received the faxes.  That issue, however, is not fully presented

by Cy's Crabhouse's submissions, and as a result the parties have not fully briefed it. For this reason, the Court is not prepared at this time to address whether and how the membership of individual class members will be proven. That issue, however, does not impact the propriety of the earlier decision to certify a class.

With regard to the arguments that plaintiff's counsel should be disqualified and its expert barred, the Court finds that Cy's Crabhouse has offered nothing new that would justify either of those rather drastic remedies. Cy's Crabhouse still has not shown any irremediable prejudice by the delay in the disclosure of the hard drive. As the Court explained above, this "new evidence" does not alter the Court's analysis regarding certification of the class. In addition, Cy's Crabhouse's expert has now had the opportunity to review the drive and submit an additional report.[2] As the Court indicated in its June 11 decision, plaintiff's counsel will be required to pay the expert's reasonable fees relating to the preparation of the supplemental report. Cy's Crabhouse is directed to file a statement of those fees within seven days of this order.

**C.      Payment to Caroline Abraham**

In its motion to dismiss, Cy's Crabhouse also raised concerns about a check for $5,000 that Brian Wanca, an attorney for the plaintiff class, sent to Eric Rubin, an attorney for the Abrahams. The memo line of the check contained the words "document retrieval." Rubin (who Abraham says does not represent her at present, but

---

[2] The Court notes that it appears that Cy's Crabhouse had the hard drive as early as January 2010, well before the date Cy's Crabhouse relies upon in its current submissions. Pl.'s Reply to Def.'s Resp. to Pl.'s Submission Re: Use of B2B Materials (Docket no. 307), Ex. B. at 54-55. Cy's Crabhouse has not explained satisfactorily why the expert did not review the pertinent materials sooner or at least advise Cy's Crabhouse's counsel that he had them.

who did briefly represent her and accompanied Joel to his deposition) marked the check "void" and returned it to Wanca. Cy's Crabhouse argued that this check was a payoff for testimony, made CE Design's discovery violations all the more egregious, and called into question the truthfulness of the testimony that Abraham and Joel gave.

The Court ruled in its June 11 decision that Wanca's tender of the check was not grounds for dismissal under Rule 37(b)(2)(A) and that the tender of the check (which Abraham's counsel refused) did not undermine the Court's earlier finding at the class certification hearing that credited Abraham's testimony. The Court did note, however, that it had "serious concern about the propriety of an attempted payment to a non-party in exchange for compliance with discovery requests." *CE Design,* 2010 WL 2365162, at *9. As a result, the Court directed plaintiff's counsel to submit to the Court a sworn explanation describing any past, current, or proposed financial arrangement between plaintiff's counsel and the Abrahams, B2B, or their counsel. *Id.*

Plaintiff's counsel have submitted these sworn statements. James Smith and Philip Bock, of the law firm Bock & Hatch, LLC, both stated that they were unaware of the five thousand dollar check, or any other financial arrangements between the Abrahams and any of the plaintiff's attorneys. The Court has no reason to doubt their statements.

Ryan Kelly and Brian Wanca, who are with the law firm of Anderson & Wanca, have provided detailed affidavits. Kelly states that the check Wanca sent to Rubin "had nothing to do with the case before this Court." Kelly Dec. (Docket no. 264) ¶ 3. He states that in conjunction with many different cases, his law firm had been making frequent and repeated requests to the Abrahams for information found on the

11

computer. Kelly states that his firm had decided to buy the computer from the Abrahams so it could do document recovery from the computer directly, instead of continually asking the Abrahams to do it. The $5,000 check, he asserts, was meant to compensate the Abrahams for the loss of their computer and enable them to buy a new one. Kelly also states that in August 2009, before the check was sent, he spoke to Rubin to seek additional documents and testimony from Abraham in other TCPA cases. He states that he discussed with Rubin the possibility of compensating Abraham for sitting for depositions or providing sworn statements in those cases and for turning over the compute, and that Rubin said he would discuss the proposal with Abraham.

Wanca states that from July 10, 2008 to April 20, 2009, he paid Abraham and her son Joel for "their time and expense in retrieving documents and sitting for depositions or sworn statements in 12 cases in which Business to Business Solutions acted as the fax broadcaster." Wanca Decl. (Docket no. 262) ¶ 7. He states that all payments were to reimburse Abraham for her claimed time and expenses in responding, and that the amounts paid were a reasonable estimate of the cost. He states that no payment was conditioned upon the content of the production or testimony. Wanca states that he wrote a check for $500 to reimburse Joel for the time and expense he had incurred to "image" a hard drive; Wanca says this amount is consistent with what his firm would have paid a third party vendor for the same service. Like Kelly, Wanca states that the $5,000 check was in exchange for the computer that the firm sought to purchase from the Abrahams so it could retrieve documents from it without assistance. He states that he believed $5,000 was a reasonable amount because the Abrahams had spent a lot of time responding to previous requests, and he

12

anticipated they would spend more time in the future responding to document requests and sitting for depositions.  Wanca asserts that he sent the check to Rubin rather than directly to Abraham "to prevent Caroline and/or Joel from simply depositing the check and then disappearing."  Like Kelly, Wanca maintains that the $5,000 check had nothing to do with this case.  He states that when Rubin returned the check, he sent Rubin a handwritten apology and decided to simply subpoena the Abrahams for any depositions that were required going forward.

Cy's Crabhouse argues that these explanations are insufficient because they are inconsistent with Rubin's testimony.  Rubin was deposed in this case and was asked a series of questions about the $5,000 check.  Rubin recalled having a phone conversation with Kelly about the Abrahams' ongoing participation in litigation.  He said, however, that he never indicated to Kelly or Wanca that any proposed financial arrangement would be acceptable to his client.  He further testified that the check arrived in a Ramada Inn envelope, with no cover letter.  Rubin says he "regarded this as a check made out to [him] to induce [him] to convince Mrs. Abraham to go further and give them additional information."  Def.'s Resp. to Pl.'s Decs. as to Fin. Arrangements (Docket No. 287), Ex. A at 11, lines 10-13.  Caroline Abraham testified at a deposition that she viewed this attempted larger payment as a "bribe."  *Id.*, Ex. B at 23, line 18.

Cy's Crabhouse argues that the attempted payment, and what it characterizes as plaintiff's counsel's insufficient explanation of the financial arrangements between the firm of Anderson and Wanca and the Abrahams, justify disqualification of plaintiff's counsel and decertification of the class.  The circumstances surrounding the attempted

13

payment may still be less than clear. That, however, does not warrant decertification of the class or disqualification of Wanca and Kelly.[3]

The rules of professional conduct of both the Illinois Supreme Court and this district provide that a lawyer may not "pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness' testimony or the outcome of the case," but may "advance, guarantee, or acquiesce in the payment of expenses reasonably incurred in attending or testifying, and a reasonable fee for the professional services of an expert witness." N.D. Ill. LR 83.53.3(15). Nothing in any of the parties' filings suggests that Wanca or Kelly paid or attempted to pay Abraham or Joel anything "contingent upon the content" of their testimony or documents. For a period of over a year, Wanca paid Abraham smaller amounts to reimburse her for time she spent collecting documents or sitting for depositions. Though Abraham and Rubin may have viewed the larger $5,000 check as an attempt to induce her cooperation, that inference is not based on any communication from plaintiff's counsel. In other words, neither Rubin nor Abraham suggests that any such inducement was proposed or even hinted at. Kelly and Wanca have both submitted sworn statements that the payment was not intended to induce Abraham's cooperation. In any event, the payment was refused.

Taking all the circumstances into account, there is no basis to justify disqualification of class counsel or decertification of the class on the grounds cited by

---

[3] The Court notes there is no evidence that Bock or Smith, who are also counsel for the class, were involved in or knew of the attempted payment. Thus even were the Court to disqualify Wanca and Kelly, it would not impact class certification.

14

Cy's Crabhouse. The Court notes, however, that the fact and form of the attempted payment were ill-considered. Plaintiff's counsel are strongly advised to avoid such tactics in the future. In addition, in the event of a favorable judgment or settlement of this case, plaintiff's counsel may not seek to recover attorney's fees connected with briefing the dispute regarding the attempted payment to Abraham.

## Conclusion

For the reasons stated above, the Court declines to disqualify the class counsel, bar the plaintiff's expert, or decertify the class.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2010